Mark Caldwell appearing on behalf of Mr. Simon. I forgot to do this in the last case. I would like to keep track of my own time, of course, but I'll try to reserve about four minutes for rebuttal if I can. I'll help you. This is, I guess I would phrase it a straight-out Social Security case, where the opinions of three treating physicians established disability. Dr. Hanisch was the treating psychologist. She wrote what I thought was a great report, and a vocational expert said that person couldn't do any work. That's at ER 947. Dr. Malanga assessed pain and assessed physical capacities, and the vocational expert said that person can't do any work. That's at 948. And Dr. Grout assessed fatigue, and the vocational expert said that person can't do any work, and that's at 949. Instead, the administrative law judge rejected all of those opinions, and my biggest criticism is that the administrative law judge basically brought his lay opinion to discredit medical evidence, saying that the opinions of all three doctors were inconsistent with, quote, the greater objective record, end quote. There were no specifics as to what in the greater objective record established an inconsistency. There was no indication that the administrative law judge had any professional qualifications to render a medical opinion. There was no medical opinion that supported the administrative law judge's physical capacities assessment, even though the ALJ said the state agency physicians were given greater weight. In fact, there's no connection between the ALJ's physical capacities findings and the state agency doctors. Dr. Caldwell, the ALJ seemed to be influenced by the treatment notes from the physicians at the Mayo Clinic, particularly Dr. Patel. Dr. Patel was not at the Mayo Clinic, Your Honor. He was a consultative examiner. Oh, I'm sorry. I'm sorry. But he relied on Patel, and I guess it was Patel's opinion that was consistent with the treatment for the treating physicians at the Mayo Clinic. That's what the ALJ said. That's what he said, and I'm here to correct him. Okay. The problem with the Patel report isn't the report itself. It's that it doesn't tell us anything, anything about the ability to sustain work-related activities. The problem, though, is that you've got a guy who's golfing regularly and engages in daily activities that the ALJ cited as giving reasons why he was exaggerating his symptoms. Okay. I'm going to hit that head-on, because I think that's the reason we're here, and I said it in my reply brief. We've got a fat-cat lawyer who made a lot of money who plays golf, and who wants to give somebody like that disability benefits? I don't think that's the way I view it. I guess it appeared to me the reason that he filed the claim for disability was that his private long-term disability carrier insisted that he do so, because the private disability carrier is looking for a way to offset the monthly payments by whatever Social Security would award him. I can't say that I saw any evidence of that in the file, Judge. I'm not saying it wasn't true. I didn't just make that up, Mr. Collier. I'm sure I read it in there somewhere. I'll take your word for it. Yeah. I think it might be in some of the correspondence between the insurer or who. But in any event, it's in the record. I believe you, Judge. I'm not disputing it. And my response to that is twofold. One, that wasn't the basis for the decision under review, and we were talking about post-op rationale before. But number two, not to be flippant, so what? The issue here is whether this man is disabled. Whether he filed for disability benefits with the Social Security Administration, pursuant to some insurance contract, doesn't mean that he's less disabled. Well, I think, as I recall, wasn't there a colloquy between your client and the administrative law judge on this issue at the hearing? I think that Mr. Simon acknowledged that that was true, that if disability benefits were awarded by Social Security, it would reduce. Well, again, let me concede that point because you obviously saw it in the record. So it's there, right? I mean, I didn't make it up. I'm not saying you did, Judge. Okay. I'm assuming that's the case. My response to you is that is not relevant to whether this man is, in fact, disabled. If that were a basis for discrediting an individual's disability, because my personal experience is that many of these long-term disability policies do, in fact, require you to apply for Social Security. Yeah, and I don't think ALJ relied on that, did he? No, he didn't, and that's why I said post-op rationale. But you asked me, so I'm responding. Well, I mean, I think, you know, you came right out and said, look, you know, one could view that as, you know, the lawyer who was making $700,000 a year and now claims. But, I mean, the problem with the case is that there are some bad facts in there, and I think the fact that he was able to play nine holes of golf, at least for some period of time, you know, usually you're up here arguing my client can't walk more than a block without having to sit down, and here we've got a guy who can walk a nine-hole golf course and maybe buy some cards, I don't know. But we don't see these kinds of facts very often is all I'm saying. But you hit the nail on the head. We really don't have evidence as to what is involved. We do know, however, that Dr. Hanisch, the psychologist, said that's your homework. You've got to get out of the house. You've got to stop looking at four walls and being in this depressed funk. You've also got notes in the record indicating this guy's playing golf in 100-degree heat in the Arizona weather, and his doctor is telling him, look, you know, your problem here is you shouldn't be playing golf when it's so hot. Again, I'm not. That's hard. I mean, if that's what he was doing, it's hard to say that he's totally physically disabled. I'm going to be honest with you. On the surface, I'm not going to dispute that that looks bad. The fact of the matter is, though, we have to have specific facts. Well, that is a specific fact. It's not a specific fact. It's a really bad specific fact for his disability claim. I didn't mean to interrupt. It's not a specific fact, and we don't know how often he did it. We don't know what accommodations were involved, as you mentioned. His testimony was he went to the golf club every day. That was his outlet for social interaction with his friends. To the club. Right. That doesn't mean he was golfing every day. Medical records seem to indicate he was playing golf pretty frequently. I don't think you have those facts in this record. I think you have. At best, I saw that at one time he played golf twice a week. There's one reference in the medical treatment notes to his golfing activity. To his golfing. There's no doubt about it. I'm not dodging that fact. What I'm saying is there has to be some connection between that fact and a finding that this gentleman was less than credible. Well, I guess when we started this by saying, you know, what's in the record to support the ALJ's determination that he was exaggerating his condition, and that's one of the things that's in the record that supports that conclusion. I wouldn't say it supports the conclusion unless there's good evidence about duration, as Judge Clifton was talking about in a prior oral argument. The issue is not what a person can do. It's how long they can do it. And remember, the test here is ability to perform work-related activities on a regular and continuing basis. But his job is a sedentary activity. It's like our job, right? Right. So, I mean, the question, I guess, is, you know, can he sit at a desk and do the type of work that either we do as lawyers, or I guess the vocational testimony was he could be a skip tracer or something. No vocational expert ever testifies that a claimant can do any job. A vocational expert just responds to a hypothetical question. So the ALJ made that point. Okay. Right. Okay. That there are jobs in the economy that he's capable of. But let's not stray too far from something else. I'm not getting away from this, but I don't want to leave this other part on the table. And that is the psychological aspects of this case. I mean, this guy is a real, real mess from a psychological point of view. That's why Dr. Hanisch said, you know, you've got to get out of the house. You've got to stop staring at four walls and just focusing on how depressed you are and what a mess your life has been since you had to abandon your career and whatnot. So even if we took this business about playing golf and put it to one side, Dr. Hanisch is the one who said, try to get out of the house as much as you can. And Dr. Hanisch's assessment led to vocational expert testimony that that person cannot sustain any work activity. That is unrebutted evidence in this file. But I do want to come back to something that you mentioned about this long-term disability business. As I've already said, I don't believe that that should be held against a person, but I think the ALJ said something that was really, really unfortunate. He said that because this gentleman was receiving long-term disability on a policy that he paid premiums for, that he had a disincentive to work, that is horrible logic. It is horrible to punish someone because they had the foresight to see that things could happen to them in the future. That's not how I read the comment. I read the comment as meaning that a person who is receiving long-term disability benefits, and we just had a case earlier this week involving a private long-term disability plan, and one of the problems is that if you get better and you are no longer disabled, your carrier cuts off your disability payments. So I read that comment as saying under these circumstances, a person would have the incentive in essence to claim that he's still disabled because he doesn't want the private carrier to cut off benefits. That's how I read the comment. That does make sense to me. That's a logical observation. But wouldn't that be true, then, of anybody who had the foresight to take out a long-term disability policy? I've got a policy that may actually claim disability. If you're disabled? But the problem is if you're disabled, how does it track back to the inference of disability? I mean, it's out there. It makes, I'm glad I have that coverage. I pay for it. I'm glad I haven't had to use it. But in this case, if you're receiving benefits, I mean, I sort of understood it the same way that Judge Tallman did. It does balance things out, so the motivation for working may not be quite the same. But you could say, I'm coming up on my rebuttal time. But, you know, let's think about this. If you took that premise logically and you pushed it logically to its ultimate conclusion, it would result in a finding that people who have the foresight to have long-term disability benefits can't be credible for purposes of getting Social Security benefits. I've got that insurance. I haven't claimed disability. Even if I claim disability, that doesn't mean I'm not disabled just because I have the insurance. But if you're receiving the benefits, it is a potential disincentive to exertion. Somebody who doesn't have any alternative may be more prepared to push himself than somebody who has that cushion to fall on. And in this case, it was an observation made that, well, the cushion is there. That's not a determining factor, but it's a factor. Okay. It could be a factor. But you mentioned earlier in another oral argument that the standard is clear and convincing reasons for rejecting either a claimant's testimony or a position. And you don't think that's a clear reason? No, not a clear and convincing reason. If it were, again, that would just mean that people who are smart enough to go. But that's not all there is. I mean, you've got the playing of golf and other activities. And by itself, no, probably not clear and convincing. But as part of the mix, well, that's the issue. Well, that's the issue. I do want to reserve my time. Thank you. Good morning, Your Honors. My name is Laura Holland, and I represent the Commissioner. May it please the Court. This is a case about an individual who, despite his mental and physical impairments, is capable of some work. While Mr. Simon may not be able to sustain his specific job as a partner at a large environmental law firm, which required frequent travel and courtroom appearances, he is certainly capable of other substantial gainful activity, whether it be as an attorney, even part-time, which would constitute substantial gainful activity still, or other work in the national economy. In his appeal, Mr. Simon argues that the ALJ erred in weighing the medical evidence and in evaluating his credibility. His argument should be rejected. First, with regard to the credibility, as has already been discussed, the ALJ articulated numerous reasons for rejecting his claims. First and foremost, the golf, which we've already touched on. And just to point out a few instances in the record, ER-519 reports to his doctor he plays golf every day. ER-459 hit golf balls two hours per day. And while plaintiff's counsel would seem to insinuate that maybe he was doing this using a golf cart. No, I was the one who was using a golf cart. I don't remember Mr. Caldwell. Okay, in either case, the ALJ here found that he could perform light work that involves sitting for 30 minutes at a time, standing for 15 to 30 minutes at a time, and walking one block at a time with the ability to change those positions at will. And that is entirely consistent with playing nine holes of golf, even if you're using a golf cart. Just to demonstrate how his activities show that he is indeed able to perform these physical demands of light work. And going on to the mental demands, Mr. Simon also reported throughout the medical evidence that he sat on a board for a nonprofit, that he socialized with his friends, you know, went to dinner a few times a week. He was active at his country club, quote, weekly, if not daily, at ER-216. He shopped weekly for food and golf-related items. And so these are Mr. Simon's own reports as to his mental and physical abilities on a day-to-day basis. And the commissioner's position is that these are certainly substantial evidence in support of the ALJ's finding that he could perform a range of light work. I would also point out that the ALJ relied on the treatment records in finding Mr. Simon's claims to be incredible. Mr. Simon himself reported that he was improved on antidepressant and anxiety medication. And Dr. Hanisch's notes, which span about 250 pages in the medical record, if you look through all of those notes, it shows that he saw her once or twice, or once a week, or once every two weeks. And on most occasions, she reported normal mental findings. Certainly there are instances within those notes that show that he was, you know, had decreased affect or lowered affect, or, you know, certainly instances where he was not showing totally normal findings. But for the most part, a review of those records as a whole show that he was mostly normal on these mental status exams. And also, as was already discussed, he had a financial disincentive to work. And regardless of his motives for taking out the policy in the first case, I think the evidence is clear in this case that he would lose at least part, if not all, of that policy if he were shown to be working. He received $4,600 a month for that policy. And the ALJ, under the Tomasetti case, this court has held that in that case the claimant had a $97,000 reserve, and the court found that it was proper for the ALJ to rely on that in finding that the claimant in that case had a disincentive to work. And the disability incentive is tax-free, is it not? I'm not sure on that, Your Honor. I think it is. So these were all legally valid, well-supported reasons. Whatever standard the court decides to apply, whether it be sufficiently specific under the Bunnell case or the clear and convincing reasons, the commissioner submits that these reasons for the ALJ's credibility finding more than satisfy whatever heightened standards the court has. And this court has applied because, as stated, this man has reported throughout the record that he is much more able to work than he is claiming now. Just turning to the medical evidence, I already mentioned Dr. Hanisch, who offered a letter opinion and a sort of circle, the form opinion, indicating that the claimant would have difficult handling, anxiety, depression, couldn't perform his past work as a trial attorney and would have moderate to severe mental limitations in his work-related abilities. And the ALJ gave numerous specific reasons for finding this opinion to not be entitled to greater weight. First, plaintiff's counsel likes to say that the ALJ didn't give any reasons, and that's just not true. I would point the court to the record at 20 through 22. The ALJ provides a lengthy discussion of Ms. Hanisch's or Dr. Hanisch's notes. He points out that only 10 days prior to offering her opinion at, let's see, I'm not quite sure. I'm not finding the citation here, but her notes dated May 10th of 2011 show that he was, you know, presenting with normal mental status examination findings, attention and concentration normal, thought processes normal, goal-directed logical and coherent thought processes, friendly and cooperative. So the ALJ pointed to that inconsistency just 10 days prior to her offering these very extreme opinions as one very specific reason to find her opinions not entitled to controlling weight. With regard to Dr. Malanga's opinion, Dr. Malanga treated plaintiff at a New Jersey sports medicine. The record I think is clear that plaintiff was having more severe symptoms when he lived in New Jersey, which is why he decided to move to Arizona. So it seems that plaintiff returned to Dr. Malanga maybe on his visits back to New Jersey. So his opinion is really not probative of plaintiff's abilities to perform work when he's in Arizona and he's functioning on an admittedly higher level. And Dr. Malanga opined that plaintiff could never use his arms or hands for any reason, which as we discussed is directly contrary to the evidence showing that he played golf regularly. Also said that he needed to use a cane. Plaintiff himself reported that he only needed a cane when traveling or in New Jersey. Dr. Gout, who treated plaintiff later, never observed, in Arizona never observed him using a cane or walking with any sort of a limp. And Dr. Malanga's opinion is even more restrictive than plaintiff testified as to his own abilities at the hearing. With regard to Dr. Grout's opinion, same type of thing. The ALJ said it was not supported by the record. The ALJ had already gone through all of these instances in the record showing plaintiff was much more able to work. Dr. Grout gave the conclusory opinion that plaintiff was unable to sustain full-time work. And also that he needed daily naps, which is just not anywhere in the record, that there's evidence that plaintiff complained to doctors that he required daily naps. And just finally, with regard to Dr. Patel's opinion, plaintiff's counsel is sort of changing his argument at first. He argued in front of the district court that Dr. Patel's ultimate conclusions were inconsistent with his GAF score. And now plaintiff is claiming that Dr. Patel's opinion should not be entitled to wait because it's only a snapshot in time. Because he examined plaintiff at one time. And under that logic, no consultative examiner's opinion would ever be entitled to wait because they're all only a snapshot in time. But what these doctors do is they look at the record as a whole and provide an objective view of the person's abilities, which is what he did in this case. And with regard to the state agency doctor opinions, the ALJ certainly gave them some weight. Dr. Bedeen offered an opinion that plaintiff could perform light work. And a lot of other state agency doctors gave opinions that plaintiff just didn't have any severe mental or physical limitations. So the commissioner submits that what the ALJ did in this case was he did not adopt those opinions, but he weighed the record as a whole and assessed an RFC that was in line with the entire record, which is what ALJs are charged with doing. And what the ALJ did in this case when he further limited plaintiff than any of these state agency doctors had assessed. I would just like to touch on the credit as true argument that plaintiff raises in his brief. The commissioner's position is that even if the court, you know, would want to apply the credit as true rule, that it's, this case doesn't lend itself to application of the rule. As I just went through, there are many differing treating physician opinions, and it would be impossible to credit all of them as true, because they're very different in their  And I don't think we get to that, because you think there's a sufficient basis to reject the testimony that if we, the credit as true rule kicks in if we conclude that there's an insufficient basis for rejecting, for example, the claimant's testimony or the treating physician testimony. You don't think we get to that threshold, so we don't need to reach the rule? Correct, Your Honor. The commissioner's position is that this ALJ's decision is supported by the record as a whole and free from harmful legal error, and that it should be affirmed. If the court decides otherwise, the commissioner's position is that the correct remedy in this case is remand for further proceedings rather than crediting plaintiff's testimony or any one or all of these treating physicians' opinions as true and awarding benefits. I hear that argument, but it's not one that we can do very much about, is it? Isn't the credit as true rule in our case law? It is in your case law, Your Honor, but cases say that it's discretionary whether to apply it. The McAllister case says if there are reasons in the record that the ALJ could point to, or there could possibly be reasons in the record that the ALJ could reject an opinion, and that the commissioner is in a better position to do that, so the case should be sent back even if the ALJ did not give sufficient reasons for rejecting an opinion. And again, I just want to highlight the fact that there are numerous differing opinions, and also, for example, Dr. Hanisch's opinion that plaintiff had moderately severe limitations. This is not an RFC. The Substanielson case, which is cited in our brief, states that those limitations need to be translated by an ALJ into something more concrete, such as simple work, sustaining, you know, more than normal breaks, things like that. So that would be an opinion that even if the court were to credit it as true, it doesn't really get us anywhere in terms of what plaintiff's mental abilities are. So in conclusion, the commissioner respectfully requests that the court reject Mr. Simon's claims and uphold the commissioner's decision. In the alternative, the commissioner requests that the court remand for further proceedings. Thank you. Thank you very much. Thank you. I have limited time, so let me hit some very important points. There's no basis for the residual functional capacity assessment. When the commissioner's own vocational expert says that limitations established by a treating source preclude all work, I don't think the commissioner can credibly argue that there's not an RFC finding, an inability to work as the RFC finding. On the psychological side, which I think is the stronger part of this case, the ALJ said he purported to rely on Dr. Patel's opinion. Please understand that the argument is not, as counsel phrased it, it is not a criticism of Dr. Patel's opinion because it was based on a snapshot. It's a criticism of Dr. Patel's opinion because he didn't talk about work-related activities. He said the claimant could sit on a couch, he could answer some questions, et cetera, et cetera. That's not the ability to sustain work-related activities. With Dr. Hanisch, I think she's the stronger part of this case because she spent so much time with this gentleman and has so much experience with him, on this golf business, you know, it strikes me as a little bit odd. She's the one who said, get out of the house, you know, stop being so absorbed in being depressed. And it almost struck me that if, you know, he hadn't done that, the commissioner would say, well, he's not following medical advice, and so that means he's not credible. So it's kind of a... That's where he had people that he knew and people who were friends. So I think that was the best option that was available to him. So the most important point I want to make in concluding is the psychological aspect of this case and the fact that the treating source that had so much experience with this gentleman assessed limitations that the agency's own vocational experts said would preclude all work is in and of itself a basis for a favorable decision in this matter. And that is my conclusion. Thank you very much, Mr. Caldwell. The case just argued is submitted, and we are adjourned for the day.
judges: Duffy, Tallman, Clifton